IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 14, 2021

## BENJAMIN LEE PEARSON, JR. v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2016-C-1778    Angelita Blackshear Dalton, Judge**

_____

**No. M2020-01267-CCA-R3-PC**
_____

The Petitioner, Benjamin Lee Pearson, Jr., pled guilty to two counts of aggravated sexual battery and received a total effective sentence of sixteen years in the Tennessee Department of Correction.  Thereafter, the Petitioner filed a post-conviction petition, alleging that his counsel was ineffective and that his guilty plea was not knowingly and voluntarily entered. The post-conviction court denied relief, and the Petitioner appeals.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JILL BARTEE AYERS, J., joined.

Daniel J. Murphy, Lewisburg, Tennessee, for the Appellant, Benjamin Lee Pearson, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

## I. Factual Background

In July 2016, the Davidson County Grand Jury returned a multi-count indictment charging the Petitioner in counts one and nine with aggravated sexual battery, a Class B felony; in counts two, three, four, five, and seven with rape of a child, a Class A felony; and in counts six and eight with aggravated rape, a Class A felony.  See Tenn. Code Ann. §§ 39-13-502, -504, -522.  On April 1, 2019, the Petitioner pled guilty to aggravated sexual battery as charged in count one and as "amended and reduced" in count two.  Pursuant to the plea agreement, the remaining counts of the indictment were dismissed.  The plea

agreement provided that the Petitioner would receive concurrent sentences of sixteen years, one hundred percent of which he would have to serve in confinement. The plea agreement further provided that, upon his release, the Petitioner would be placed on community supervision for life and that he would register as a sex offender. Finally, the plea agreement provided that the Appellant would undergo sex offender treatment.

The State presented the following facts during the guilty plea hearing:

> On July 20, 2016[,] police responded to . . . Haynes Street, which is located in Davidson County. They responded to a shots call, a shots fired call. When they arrived on the scene they spoke to [the victim's mother]. She reported that she came home from work that day and found her husband, [the Petitioner,] in bed with her 11-year-old daughter[, the victim]. [The victim] identified that she had been molested by [the Petitioner]. [The victim's mother] chased [the Petitioner] out of the home and shot a firearm into the air to get him to stop. When [the victim], whose initials are KBS, whose date of birth is 12-8-2004, was forensically interviewed[,] she said that [the Petitioner] had penetrated her vagina on multiple occasions dated back to May 1, 2015.

When questioned by the trial court, the Petitioner agreed that the facts presented by the State were true.

Subsequently, the Petitioner filed a timely pro se petition for post-conviction relief and a "Supplemental Petition for Relief from Conviction or Sentence," alleging that he was denied effective assistance of counsel. After the appointment of counsel, the Petitioner filed an amended petition for post-conviction relief wherein he argued that guilty plea counsel[1] was ineffective in his investigation "into [the victim's mother's] conflicting statements" and in advising the Petitioner regarding the plea deal. The Petitioner also asserted that "his plea was neither knowing nor voluntary" and "was a product of '[i]gnorance, incomprehension [and] terror.'" Boykin v. Alabama, 395 U.S. 238, 242-43 (1969).

On August 27, 2020, the post-conviction court conducted an evidentiary hearing during which the Petitioner, second trial counsel, and guilty plea counsel testified. At the

---

[1] The record reveals that the Petitioner was first represented by initial trial counsel. After she was relieved from representation in December 2016, second trial counsel was appointed. Thereafter, second trial counsel was relieved from representation on February 8, 2017, and third trial counsel was appointed. Finally, on June 7, 2017, third trial counsel was relieved from representation, and guilty plea counsel was appointed.

outset of his testimony, the Petitioner denied molesting the victim and stated that the facts presented against him during the guilty plea hearing were false. The Petitioner maintained that the night before the incident, he got into an argument with the victim's mother while "partying, drinking and popping Percocets[,] and snorting a little cocaine." The Petitioner "passed out" and awoke to the victim's mother "hollering and screaming with a gun pointed at me." The victim's mother kept "screaming and the next thing you know she fired off about three shots in the air and said don't come, don't come close to me . . . ." A neighbor called the police, and the Petitioner was arrested. The Petitioner was later charged with numerous sexual offenses.

After his arrest and prior to entering his guilty plea, the Petitioner was represented by four appointed attorneys. The Petitioner had a disagreement with initial trial counsel, and she was removed from the case. Second and third trial counsel represented the Petitioner while he was in jail; however, after the appointment of guilty plea counsel, the Petitioner was released on bond on October 7, 2017.

The Petitioner said that while he was in jail, the victim's mother visited him "about 10 or 15 times." The Petitioner stated that he refused her visits on several occasions because she was "not going to tell them people the truth . . . ." The jail visitation log was entered into evidence. The victim's mother also sent the Petitioner letters. According to the Petitioner, the victim's mother's letters expressed that she loved the Petitioner but that she was upset because he cheated on her and that she was "going to make things right." The Petitioner informed second trial counsel that he was communicating with the victim's mother and that the victim's mother "did a notary and a tape . . . confessing [the Petitioner's] innocence" to second trial counsel. Afterwards, second trial counsel asked to be removed from the case because he was "now a witness."

The Petitioner said that after guilty plea counsel was appointed, the Petitioner informed him that the victim's mother's statements demonstrated the Petitioner's innocence because "basically she set this whole thing up." Guilty plea counsel, however, "just kept putting [the Petitioner] off as far as not wanting to listen to what [the Petitioner] had to say because basically [guilty plea counsel] had his own conclusion of what is going on." The Petitioner stated that guilty plea counsel "never investigated" the case and, instead, sought a plea agreement. The Petitioner stated that guilty plea counsel failed to locate the letters the victim's mother wrote to the Petitioner while he was in jail and failed to enter them into evidence.

The Petitioner testified that guilty plea counsel "was stuck on the DNA" and "anything else was kind of irrelevant" to him. When asked for a reason his DNA was found on the victim, the Petitioner surmised that the victim's mother transferred his DNA to the victim. The Petitioner noted that when the victim was examined after the accusations, "everything came back atraumatic." The Petitioner stated, "All I know is [the victim's

- 3 -

mother] did it, I mean, that is just basically what it was out of being a scorned woman." The Petitioner stated that if he had sexually abused the victim, there would have been no reason for the victim's mother to visit him in jail. In addition, the Petitioner stated that he and guilty plea counsel did not discuss hiring a defense expert to examine the DNA evidence.

The Petitioner stated that he initially wanted to plead to a "Class C sexual battery" for "3 to 6" years. Guilty plea counsel, however, told the Petitioner "the family don't want to do that" and the State had offered the Petitioner a sentence of twenty-five years. The Petitioner refused the twenty-five-year offer, stating, "I wasn't trying to take no time for nothing for something I know I ain't done." The negotiations continued, "[a]nd 25 went to 22 at 100 percent and 22 went to 18 at 100 percent and . . . then it went to 17 at 100 percent and then it got down to 16." The Petitioner believed that he ultimately pled guilty to two counts of aggravated sexual battery in counts one and two, that counts three through nine were dismissed, and that he would serve eight years at one hundred percent for each conviction. According to the Petitioner, "the two 8s would be run concurrently, but you would still have a total of 16 years."

The Petitioner stated that before he entered the guilty plea, guilty plea counsel explained the difference between concurrent and consecutive sentencing and the mandatory minimum sentence of twenty-five years the Petitioner could face if convicted of rape of a child at trial. The Petitioner explained, "So me being 40 something years old, I am saying, hey, man, I can't, I can't afford to do no 25 years, so I'm like I'm going to duck low and go and then my family said, look, man, I mean, basically, you know, we don't really have the money to really get you adequate, adequate, but the 8 years sounds go, duck low and go and so that is what I did."

The Petitioner recalled the plea colloquy wherein he agreed with the facts as presented by the State and to the sentences he faced under the agreement. Though the Petitioner heard the prosecutor say his sentence was sixteen years, the Petitioner "thought that was the total . . . because I was pleading to two counts." After entering the plea, the Petitioner began talking with others in prison who explained that he had actually pled guilty to two sentences of sixteen years rather than two sentences of eight years. The Petitioner discussed his sentences with the case manager in jail, who confirmed the Petitioner received "16 years at 100." Upon learning this, the Petitioner contacted guilty plea counsel, who stated he would "get it fixed." However, guilty plea counsel "kept putting [the Petitioner] off" until eventually, guilty plea counsel "didn't want to talk to [the Petitioner]." The Petitioner then filed the instant petition for post-conviction relief.

During cross-examination, the Petitioner stated that he expected the victim's mother to testify at the post-conviction hearing to verify his testimony, although he did not know if she was in court. Regarding the day the police were called to his home, the Petitioner

- 4 -

stated he did not know if the victim's mother went to work because he went to bed after "partying." The Petitioner recalled reviewing the discovery and learning the victim's brother told the police that the Petitioner told him to go outside while he "gave [the victim] a whooping." However, the Petitioner did not recall telling the victim's brother to go outside or the victim's mother saying the victim's brother was outside when she returned home.

The Petitioner stated that the victim was eleven years old at the time of the offense and that she talked with the police and participated in a forensic interview with the Nashville Children's Alliance. The Petitioner acknowledged the victim disclosed during the forensic interview that the Petitioner committed numerous sexual assaults against her and that the forensic biology report identified his semen inside the victim's labia majora; however, the Petitioner did not recall the report identifying his semen inside the victim's inner labia. The Petitioner acknowledged the report indicated that the chance of the DNA belonging to anyone else was more than one in one hundred trillion. The forensic biology report was entered into evidence along with the transcript of the plea colloquy.

Second trial counsel testified that he was appointed to represent the Petitioner "on what was a charge of child rape . . . involving . . . a nine-year-old."[2] Second trial counsel's representation was brief. He recalled both the Petitioner and the victim's mother disclosed that they communicated with each other while the Petitioner was in jail. As a result, second trial counsel set up a meeting with the victim's mother and planned to record their conversation about the allegations against the Petitioner. However, before doing so, the victim's mother called second trial counsel and indicated she "hadn't told the truth before." Second trial counsel then met with the victim's mother and contacted the State "because [second trial counsel] realized that [he] was probably about to become a witness . . . and [he] knew it was very important to, to get what she had to say in front of somebody." Prior to meeting with the State, second trial counsel explained he did not want to influence the victim's mother, but he told her "that there is such a thing as perjury" and that "we don't need to lie about anything." During the meeting with the State, however, the victim's mother changed her story again. Second trial counsel stated that after the victim's mother provided the same story to the State that she provided to him, "there was some questioning and talking and I think then that [the State] also explained the evidence that he had and that how her testimony wasn't necessary really, but that she could be opening herself up to some charges and could be hampering an investigation." As a result, the victim's mother "ended up saying that she did not make the story up and that the allegations that she originally alleged were true." Second trial counsel immediately contacted the trial court, informed the Petitioner of the conflict, and ultimately withdrew from the case. Second trial

[2] The record indicates that the Petitioner waived his right to have second trial counsel in the courtroom, after which second trial counsel testified via Zoom.

counsel did not recall a written confession from the victim's mother but stated if one existed, it would be in the case file. The Petitioner did not offer any additional proof.

The State presented testimony from guilty plea counsel, who stated he had practiced criminal law for ten years. Guilty plea counsel reviewed the discovery with the Petitioner, including the victim's forensic interview. Guilty plea counsel found the victim's forensic interview "very compelling" because she "could very adequately and eloquently list separate times, events, separate explicit sexual acts that she performed that were committed that without emotion or, you know, any type of diversion or seemed to have been any coercion, just simply speaking and answering questions." Guilty plea counsel noted the victim's forensic interview was corroborated by the victim's mother, the victim's brother, the DNA report, and the physical evidence at the scene. Based upon the evidence, guilty plea counsel believed the State would have been able to prove the Petitioner committed rape of a child.

Guilty plea counsel agreed with the Petitioner's claim that guilty plea counsel focused on the DNA evidence at issue because they did not have a defense for the DNA evidence. Guilty plea counsel did not believe they could have provided a credible explanation regarding why the Petitioner's DNA was on the victim, stating, "[A] jury is going to have a difficult time hearing any other reasonable explanation as to wh[y] an adult male['s] semen was found inside of a child's vagina and I think I said it just like that." Therefore, guilty plea counsel made the strategic decision not to move forward with that type of defense, explaining to the Petitioner that it was the Petitioner's decision whether to accept a plea agreement or go to trial but that they would not be able to adequately address the DNA evidence at trial. Guilty plea counsel advised the Petitioner that "it might not be a good option for [him] to go to trial, because of this so far irrefutable DNA evidence that . . . the jury was going to hear because I was[] not going to be able to get it suppressed."

Regarding the victim's mother's varying stories, guilty plea counsel said the State did not plan to call the victim's mother as a witness during trial. Guilty plea counsel explained to the Petitioner that "even if the jury believed that the initial call for service for the police from [the victim's mother] was bogus," it did not "take away from the fact that we found something and that there is more and more corroborating evidence to support these initial allegations that even if we say were just completely made up." Guilty plea counsel "warned [the Petitioner] that [the victim's mother] could not create the reasonable doubt needed even if [guilty plea counsel] got her to admit that on the stand that she lied about the inception of the investigation into why she called the police." Guilty plea counsel advised the Petitioner of the risks he faced at trial based upon the strength of the State's case and warned the Petitioner "if somehow we went to trial and only one count was found guilty, the Court would still with sentencing have discretion to put him between 25 to 40 years." Thus, guilty plea counsel advised the Petitioner to seriously consider the offers that presented "something that you couldn't get if you had your chance in court and lost."

- 6 -

Regarding the actual plea agreement, guilty plea counsel noted the Petitioner pled guilty and received a lower sentence than he would have faced had the State been successful on even one count of the indictment. Guilty plea counsel rejected the Petitioner's testimony that the Petitioner believed he was pleading to two eight-year sentences. Guilty plea counsel stated that "[t]he number 16 was significant" to the Petitioner and that he explained to the Petitioner that a sixteen-year sentence, "especially with it being able to be reduced even by the 15% with his credit from TDOC[,] is as good as it is going to get."

Regarding plea negotiations, guilty plea counsel explained that he and the Petitioner "got a chance to speak pretty frequently and discuss matters." Guilty plea counsel stated that although a plea deal "was not [the Petitioner's] ideal resolution of the case, that this is the best possible chance that he would have." Guilty plea counsel stated:

> [W]hen we came to court and we wrote up the plea and I discussed it with him it wasn't like he was forced to do that, he knew that even if the day of the plea he changed his mind, if he said, you know what, I don't want to take this, I want to have a trial he still had that option.

Guilty plea counsel said that a couple of days prior to the plea hearing, he spoke with the Petitioner "to make sure that everything was okay." The Petitioner said, "I'm fine. I'm okay with it." Guilty plea counsel said that the Petitioner was not intoxicated on the day of the plea hearing and that the Petitioner was "calm." Guilty plea counsel reviewed the guilty plea petition with the Petitioner and explained the benefits of entering a plea pursuant to Hicks v. State, 945 S.W.2d 706 (Tenn. 1997),[3] noting that based upon the Petitioner's jail credits, he thought it would be best to "have an agreed upon 16 year sentence for these two running concurrent, that way it is not consecutive sentencing which is worst with TDOC, just as a rule, but all of this credit and time that he has had would go towards all of the cases." Guilty plea counsel stated that the Petitioner understood these conversations, which occurred prior to the entry of the plea. Guilty plea counsel recalled that after the guilty pleas were entered, the Petitioner called him about errors on the judgment forms, but guilty plea counsel denied that the Petitioner challenged the length of the sentences imposed.

During cross-examination, guilty plea counsel stated he briefly considered hiring an independent expert to examine the victim's forensic interview, but he did not do so because

---

[3] State v. Hicks, 945 S.W.2d 706, 709 (Tenn. 1997), held that an offender may negotiate a plea agreement for a sentence encompassing one range for release eligibility purposes but another range for determining the length of sentence.

the goal was to resolve the case before trial. Guilty plea counsel stated had the case gone to trial, "that would have triggered many more examinations of . . . and needing assistance with preparing for the defense of the trial." Guilty plea counsel believed the Petitioner "was placing too much emphasis on the importance of" the victim's mother's testimony and noted though he had defenses available to argue, he did not believe his defense "would have been as compelling as the State's ability to put on proof."

Furthermore, regarding the forensic interview, guilty plea counsel noted that if he had watched the victim's interview and "saw something or even an innuendo or a hint" of something that called for investigation then he would have hired an expert to do so "without question." However, guilty plea counsel did not believe he should have hired an expert to evaluate the victim's forensic interview or the DNA evidence prior to entering into plea negotiations. Guilty plea counsel again noted, "If the matter would have been set for trial I would have gotten experts." Guilty plea counsel was aware that the penetration of the victim was described as "atraumatic." However, guilty plea counsel stated that was not a compelling argument and told the Petitioner, "[I]f I am arguing that . . . the penetration was not traumatic," then "we have lost our rape of a child case." The forensic medical examination was entered into evidence.

Regarding the Petitioner's contention that he wanted to argue the victim's mother's conflicting statements supported the theory she planted the Petitioner's semen on the victim, guilty plea counsel explained to the Petitioner that the State still had a compelling case even if the victim's mother was successfully impeached. Guilty plea counsel told the Petitioner that if the Petitioner testified and presented that story to the jury, his testimony would subject him to cross-examination and that the State would likely argue the Petitioner was merely speculating about how his DNA was found on the victim. Guilty plea counsel advised the Petitioner of the "significant risk" he faced at trial.

Regarding the sentences imposed under the plea agreement, guilty plea counsel stated he was "confident in our discussions that [the Petitioner] understood quite well and quite vividly the idea that he was taking a 16-year-sentence on two counts running concurrent." Guilty plea counsel did not believe the Petitioner was confused as to concurrent versus consecutive sentencing, stating, "[H]e did ask those questions repeatedly and I answered them every time." Guilty plea counsel also explained to the Petitioner that he was entering into a sixteen-year guilty plea pursuant to Hicks, and guilty plea counsel believed the Petitioner understood. Guilty plea counsel stated:

> There was not an exhaustive conversation about State v. Hicks, but I did say that doing it this way is better for him and so I said having two consecutive sentences is not good ever and so if you can have concurrent and I mentioned I made it a point that even though you are pleading to two, it is still just the 16,

you know, I said it is no difference in pleading to two eights, 8 plus 8 it is still two convictions, but I said doing it that way the numbers may be smaller but the time would be greater.

At the conclusion of the evidentiary hearing, the post-conviction court took the matter under advisement before entering a written order denying the Petitioner's request for relief. This timely appeal followed.

## II. Analysis

On appeal, the Petitioner alleges guilty plea counsel was ineffective because he failed to adequately investigate the case prior to the entry of the guilty plea, which the Petitioner asserts "was premised on . . . ignorance and incomprehension." The Petitioner further contends that his guilty pleas were not knowingly or voluntarily entered. The State argues the Petitioner has failed to meet his burden of proving his claims. After our review, we agree with the State.

The Petitioner bears the burden of proving his post-conviction allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). This court will not reweigh or reevaluate evidence of purely factual issues. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this court reviews the Petitioner's post-conviction allegations de novo, affording a presumption of correctness only to the post-conviction court's findings of fact. See id.; Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the Petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient

- 9 -

performance prejudiced the defense. This requires showing
that counsel's errors were so serious as to deprive the defendant
of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the Strickland test must be satisfied. Id. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." Id.; see also Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the Strickland test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

The Petitioner claims guilty plea counsel failed to properly investigate the victim's mother's conflicting statements and asserts guilty plea counsel should have hired defense experts to investigate "the State's DNA evidence and the victim's forensic interview." The Petitioner argues "an investigation likely would have revealed favorable evidence due to the victim's own mother recanting what she had told the police." The alleged ineffectiveness highlighted by the Petitioner, however, is not supported by the proof presented.

Instead, the record indicates that after investigating the Petitioner's case, guilty plea counsel reviewed the discovery, which included the victim's forensic interview, DNA evidence identifying the Petitioner's semen in the victim's vagina, and the victim's mother's changing story. Both the Petitioner and guilty plea counsel testified that they engaged in detailed discussions regarding the charges the Petitioner faced, the evidence against the Petitioner, the strategy guilty plea counsel would pursue if the case went to trial, and the strengths and weaknesses of the Petitioner's defense. Regarding guilty plea counsel's alleged failure to investigate the victim's mother's recantation of her initial report to police and the effect it would have had on the Petitioner's defense, guilty plea counsel explained that given the strength of the State's case, he did not think further investigation

- 10 -

of the victim's mother's recantation of her initial report to the police would have had a positive effect on the Petitioner's case. Accordingly, guilty plea counsel did not center the defense around the victim's mother's potential testimony, especially after learning the State did not plan to call her during trial. Guilty plea counsel also did not find the Petitioner's proposed theory, that the victim's mother placed his semen on the victim, to be compelling. The post-conviction court accredited guilty plea counsel's testimony, and nothing in the record preponderates against its factual findings or indicates that guilty plea counsel's strategy was not sound. See Tidwell, 922 S.W.2d at 500; Strickland, 466 U.S. 689. The Petitioner is not entitled to relief.

The Petitioner also asserts guilty plea counsel was ineffective for failing to hire independent experts to review the DNA evidence and the victim's forensic examination. However, the record is replete with guilty plea counsel's detailed reasons for not hiring experts while negotiating the guilty plea on behalf of the Petitioner. Guilty plea counsel testified that both the DNA evidence and the forensic examination of the victim were compelling and that he did not encounter anything to make him question their legitimacy. In addition, guilty plea counsel stated that had the case gone to trial, he would have hired defense experts at that point. Nothing in the record indicates trial counsel's strategy was not sound. See Strickland, 466 U.S. 689. Additionally, in order "[t]o succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." Id. Because the Petitioner failed to call an expert to testify regarding the DNA evidence or the victim's forensic interview during the post-conviction hearing, he cannot meet his burden. See id. This issue is without merit.

Finally, the Petitioner asserts his guilty plea was entered as a result of "his ignorance and incomprehension of the proceedings." The Petitioner argues that "although [his] plea colloquy would otherwise suggest that he understood he was pleading to a concurrent sixteen-year sentence, [his] compelling post-conviction hearing testimony would suggest otherwise; the Petitioner believed he was actually pleading to two eight-year sentences to be ran [(sic)] together concurrently." The State asserts "nothing during the plea colloquy suggests that the [P]etitioner misunderstood his sentence," and as such, the Petitioner "has not overcome the strong presumption that his plea was entered knowingly, intelligently, and voluntarily." We agree with the State.

In denying relief, the post-conviction court examined the Petitioner's guilty plea in the context of his post-conviction claims, stating:

As evinced by the transcript of the plea hearing and [the Petitioner's] post-conviction testimony, he acknowledged the State's announcement of the sentence recommendation of sixteen years. At the plea hearing, when asked by the [c]ourt if this was what he understood the plea agreement to be, [the Petitioner] responded "[y]es ma'am." When asked by the [c]ourt at the plea hearing whether he went over the plea petition with his attorney, whether he understood everything in the plea petition, whether his attorney answered any questions that he may have had, and whether the signature on the plea petition was his, [the Petitioner] affirmatively answered each question. While the Petitioner now contends that he was not aware that he was pleading to a sentence of sixteen years, the record reflects that at the time that he entered the plea, he responded under oath that he understood the agreed upon a sentence of sixteen years. The [c]ourt respectfully finds [the Petitioner's] testimony regarding his impression that he would serve two eight-year concurrent sentences incredible. The [c]ourt credits [guilty plea counsel's] testimony that he spoke extensively with [the Petitioner] about the plea agreement and that the sixteen-year sentences would be outside of the sentencing range. Because it appears from the record that at the time the Petitioner entered the plea that he understood the plea agreement and consequences, this [c]ourt finds that the Petitioner's plea was knowingly, voluntarily, and intelligently entered.

The record indicates the trial court properly and thoroughly explained the nature and consequences of the Petitioner's guilty plea, including the charges against the Petitioner and the penalties he faced as a result of the plea. Further, the record demonstrates that at the time the Petitioner entered his guilty plea, he understood he would receive two, concurrent, sixteen-year sentences for two aggravated sexual battery convictions and that he would avoid the remaining indicted offenses. Throughout the guilty plea hearing, the Petitioner affirmed that he understood his rights and wished to proceed with the guilty plea. The Petitioner has failed to offer any evidence that preponderates against the post-conviction court's characterization of the knowing and voluntary nature of the Petitioner's guilty plea. See Tidwell, 922 S.W.2d at 500.

Once a guilty plea is knowingly, voluntarily, and intelligently entered it is not void simply because the Petitioner is no longer happy with his decision. Robert L. Freeman v. State, No. M2000-00904-CCA-R3-PC, 2002 WL 970439, at *2 (Tenn. Crim. App. at Nashville, May 10, 2002). Further, in order to succeed on his ineffective assistance of

counsel claim, aside from presenting clear and convincing factual evidence establishing counsel's deficient performance, the Petitioner must also establish prejudice. Specifically, the Petitioner must show that but for counsel's alleged deficient performance, he would have insisted on going to trial. See Grindstaff v. State, 297 S.W.3d 208, 216-17 (Tenn. 2009); Strickland, 466 U.S. at 687. The Petitioner has not met this burden because no evidence exists in the record to support the Petitioner's attack on guilty plea counsel's performance or how the alleged deficient performance affected the outcome of his guilty plea. See Strickland, 466 U.S. at 687. Instead, the record is filled with evidence that the Petitioner understood the options he faced prior to entering his guilty plea, the sentencing associated with the guilty plea, and the rights he waived upon entering the guilty plea. Thus, not only has the Petitioner failed to show counsel was ineffective, but also he cannot prove he was prejudiced. Without proof of prejudice, the Petitioner's claims fail and he is not entitled to post-conviction relief on the grounds of ineffective assistance of counsel.

### III.  Conclusion

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE